Department of Health and Human Services, United States Department of Health and Human Services, United States For the Secure Web Conference Corporation v. Microsoft, 2015-1321. Is it Mr. Helga? Helge, Your Honor, Helge. Yes, sir. May it please the Court. We are here because the district court construed four terms in two related patents at issue to include limitations that are not supported by the specification and, in contrary, to the express disclosure of the specifications of these patents in suit. Three of these terms refer to the term device. We have security device. We have network communication device. We have input-output device. The court incorrectly construed each of those devices to be stand-alone, external to and separate from other devices, again, contrary to the express disclosure of the specification. The fourth term is point-to-point communication session. In some claims, they throw in electronics as well, electronics communication session. There, the district court incorporated a negative limitation based on a specification that uses the term IE with reference to non-point-to-point communications without actually dealing with what is expressly disclosed about point-to-point communication session. That negative limitation is also not supported by the specification. Your Honor, so I'll speak first about the device terms in general. Microsoft claims that you cannot take the device term out of the claims from which it's being construed, and that argument is incorrect. In fact, at the court below, they provided definitions of device, and indeed, the district court used that term device as its foundation for construing the device terms as separate, stand-alone, and external. It didn't rely on the adjectives occurring before device. It didn't look to security, for example, as the basis for construing these as separate from external to or stand-alone. In addition, if you were to look at the 686 patent and the 687 patent, which are both related, they consistently use the term device in context in which one device may be a component of another device. They don't have to be stand-alone. So for example, in Figure 2 of the 686 patent, and also Figure 2 of the 687 patent, we have a depiction of the security devices of each patent. Within those devices, we have, in the 686 patent, we have an encryption-decryption device, 130, contained within security device. Similarly, in the 687 patent, we have ports or connections for input-output data, for example. We have ports being referred to as device. We have Claim 1 of the 687 patent, which recites a claim to a device comprising other devices. Where did the district court go wrong? The district court went wrong by assuming the ultimate conclusion, that because one device is recited differently from the claim in another device, that they somehow couldn't be embedded. But now these are electronics patents. What about Claim 29 of the 687 patent? It talks about selecting a configuration. It talks about that configuration being dependent upon the presence of a network communication device and an input-output device in which there's a plurality of communication ports. Why doesn't that imply transience, as the court found, which then in turn implies separateness? Your Honor, if you look at the district court's opinion on that point, it really focused on only part of the language of that claim. You're right, it is dependent upon the presence of a network communication device and an input-output device. But the rest of the language is in communication with said selected ports. We're not just looking at existence, presence. We're looking at presence in communication. Now it's true that it is possible to be transient. It is possible that there are devices that could be disconnected or reconnected, for example. But it doesn't preclude the possibility that there could be constant existence and simply not in communication. So we have to look beyond simply the presence, but we have to look at the presence in communication. So you're saying when it says dependent on presence, that could be broad enough to include ever-presence? Absolutely, Your Honor. Absolutely. And I think it covers both situations. So you would always have one configuration. You wouldn't actually select a configuration. It would always just be one. There could be a default, Your Honor. There could be a default configuration when there is one device that is always present and is available for being in connection with the port. But I believe you have to look at the entire phrase. It's not simply presence, but it's presence in communication. This is consistent with the 687 patent's discussion of the term device, where it doesn't require separateness. It doesn't require housing. Again, this is an electronics patent. I agree with you. The device is pretty broad, and it doesn't require separateness, that word alone. But I don't understand how in-communication changes when you have to have selecting a configuration dependent upon the presence. How that would include just being always present. Again, Your Honor, I think it comes down to the presence in communication. So for example, you may have a hierarchy where you say the device is going through a selection process, and it wants to go with a first port, and it checks whether there's a connection there. And if there's not a device there, then it moves to the next port. And if there's a device there, but there's no communication, for example, it's not turned on, or it may be something that has to be activated, then you go to the third. And now this is shown in Figure 6 to some extent with respect to the algorithm that the device is going to go through. But it simply doesn't look for presence, but it's presence in communication with. And I think we have to look at both of those elements. And the district court looked only at presence, and it stopped after that. And so it missed the in-communication portion. In the 686 patent, we also have Figure 1. Now, MBO Labs, a case from this court, has said that the invention doesn't necessarily need to look like the figures. And we have Figure 1 talking about a computer, a phone, and a facsimile machine, and then a security device. Now where did the separate standalone and external phrases come from? It really came from Microsoft's characterization of this figure. In effect, the district court elevated the value of Microsoft's characterizations beyond what is actually disclosed in the patent. The patent says that Box 50 is a first location. We know that the computer, the facsimile machine, and the telephone, and the security device are at the same location. That is what the patent says about physicalness, or geography, of this arrangement. Now what is more epitome of same location than one device embedded into another? Again, these are electronics patents, and the arrangement of the housing is really fairly arbitrary. And you won't see, for example, you won't see the prosecution history in the Joint Appendix. In fact, neither party relied upon it, because there isn't any sort of discussion of physical arrangement that leads to these patents being issued. A couple of times in the specification, there's a reference, for example, at column 11, lines roughly 12 through 15, to the advantage of the invention in that the security device being separate from the computer allows the encryption to be preserved, even if the computer is lost or stolen. That suggests, to me at least, separateness of the two. Your Honor, this actually leads us very well into the second term, which is the point-to-point communication session, because what we're talking about here in column 11, specifically at line 6, is we're talking about the separateness in the context of the permanent key. That permanent key gets us to the non-point-to-point communication session phrase, which is contrary to the point-to-point. These claims are directed to point-to-point, which the patent makes clear is different from non-point-to-point. Let me return you, if I could, to what's really troubling me about this passage, which is that it sounds as if it's saying one of the advantages of this invention is that you are not going to be exposed to having your encryption system, keys or whatever, compromised by the loss of your computer. As you would, for example, if you had the encryption and the microprocessor, the encryption – well, the security device and the microprocessing-based device, both in the same single entity, as in a cell phone, let's say. Why isn't that pretty good support for the proposition that they're separate? Well, Your Honor, it's certainly a proposition that they could be separate, but it certainly doesn't require it. But why isn't that? This is speaking about the advantage of the invention, not, as far as I can see, specific to a limited embodiment. Why isn't that something that is a benefit of the invention as a whole? Well, Your Honor, again, this is very specific to the non-point-to-point context in line 6, where you're talking about a permanent key. For point-to-point, you're going to have a new key for every session. So the same concern for losing your computer or having your computer and security device taken and having that key out there for the world to use is not a concern necessarily in the point-to-point, because that new key is being generated every time you create a session. That's exactly the issue here with the non-point-to-point versus point-to-point. When you refer to a session here, what do you mean by session? Because that word is used somewhat differently in different settings. I want to know what you think the use of the term is in the context of this patent. Your Honor, in the context of this patent, session and the idea of point-to-point versus non-point-to-point sessions deals with timing of transmission and receive. Well, OK, but what's a session if you and I are having an exchange and we have an exchange now which goes back and forth between us, we pause, we stop that event, and an hour later we have another exchange? How many sessions have we had? Your Honor, if there's a pause or, for example, if I put data out there and then I leave the room and we wait for you to retrieve that data, that would be non-point-to-point because there isn't a real-time exchange of conversation. I'm really trying to get the word session in my mind as to what this patent means when it uses that term. I send you a message. Is that a complete session? It depends on whether I've received the message. I send it, you receive it. That would be a session. And then you send a message back to me. Is that a second session? If the devices haven't, well, in the context of this patent, Your Honor, if the devices haven't had to reestablish some connection to each other, then that wouldn't be part of the same session. But for example, if I come up here and I say, may it please the Court, and I give you one argument and then I sit back down and I have to come back up and say, may it please the Court for another case, that would be, so for example, this is one session. All right. Okay. Does that make sense? I think I understand. Is there a difference between the language point-to-point communication session, which is in the claims, and point-to-point transmission, which is what is in the specification? Well, Your Honor, point-to-point transmission is what occurs during a point-to-point communication session. It's really referring to the data transmission. And what you may be keying into is the term appearing at the bottom of column 10 of the 686 patent, which discusses non-point-to-point transmissions, i.e. over the Internet. Now, that's describing a medium, a characteristic of how those non-point-to-point transmissions are occurring. The specification talks about an attachment to an email, for example, or a data repository where the sender is taking a file or data, putting it somewhere for the receiver to then later retrieve it. And the problem is, with this patent, or what this patent recognizes as an issue, is that when you send a transmission, and it's part of the same communication session, both parties know what the key is. There's basically an encryption-decryption key created for that session. And so the data transmission and the receiver is occurring in the context in which both parties know what the key would be. It's a temporary key for that session. Do you think that the patent drafters used the term IE when they meant to use the term EG in the context of this IE over the Internet? Well, Your Honor, I think what they intended here was to provide a characteristic of the non-point-to-point transmissions. Well, IE is worse for you than EG. I think we can all agree with that. It makes your case harder. I disagree, Your Honor. And I know Microsoft has pointed to SkinMedica. If IE means id est, which is what it means, that means they are equivalent. And that, it seems to me, makes the road tougher for you. EG, exemplum geratus, would mean it's just an example. Your Honor, if we only look at that soundbite. Well, yeah, but I want you to answer me if you think that we should be looking charitably towards the use of the term IE and assume, perhaps, that the drafters actually meant EG, which a mistake that is made with some frequency among even native English speakers. Certainly, it's possible, Your Honor, that they made a mistake. I think if you look at the term, this clearly isn't a definition. This is describing a characteristic of non-point-to-point. But IE is a definitional term. I understand, certainly, that under SkinMedica, that there is a definitional term being imparted. And it could be that this is a mistake in that context because they didn't use terms that indicate definition. They used a characteristic. Mr. Helge, your time is up, but we'll give you three minutes of rebuttal time. Thank you. We asked a lot of questions. Mr. Peterman? May it please the Court. The structure of the claims of the patents in suit require the different devices at issue in this appeal to be standalone, separate, and external. The totality of the intrinsic record confirms this. It's not just a single embodiment that uses a separate, standalone, and external security device. It's the entirety of the intrinsic record. Starting with the claims themselves, Claim 1 of the 686 patent requires one to provide a plurality of security devices, each being associated with at least one of said plurality of microprocessor-based devices. That in and of itself tells one of Skilney Art that you are adding security devices to microprocessor-based devices. Are you relying specifically on the language associated with there? That is part of what we are relying upon, because as the district court found, associated with does imply some transience and separability, as opposed to an embedding. We take this language from the claim, then you look at the rest of the intrinsic record. From the intrinsic record, it's very clear that what was being invented here was this combination of microprocessor-based devices. Going back to the associated with, I'm not sure, could you expand on why it is that the word associated suggests transience, as the district court said, because it doesn't necessarily suggest it to my ear. The term associated with, and we are reading this in combination with the rest of the intrinsic record, which definitely shows the separability, associated with, to my mind, implies something less than being within something else. Rock bands could be associated with each other, but they are different bands. What if you are associated with a law firm? It means you are within that law firm. It means that there is some connection to that law firm, but in connection with electronic devices and with the rest of the intrinsic record that we are discussing here, associated with, we believe, implies some link as opposed to a device coming out that has a security device inside of it. The court, district court, did not rely upon solely associated with, and we are not solely relying upon associated with. We take associated with as a suggestion, and the Apple case that we cited in connection with our brief showed that this court, on occasion, has believed that associated with means something less than embedding. It means a link, which is consistent with how we are interpreting associated with. Now, that Apple case, it did not actually define the term associated with, did it? The term associated with was not the claim construction that was at issue, but in the discussion of the claim construction, this court did take that term and stated that it means a link as opposed to, well, less of a connection as opposed to embedding or link, but you are correct. Associated with was not the claim term that was definitively at issue, but it was addressed. With respect to the law firm example, might you say that an associate is not yet part of the firm? This is true. Having been on both sides of it, I'm not sure which side is better, but that is correct. Associates are not yet members of the firm. When you turn to the rest of the intrinsic record, both from the field of the invention which talks about the present invention relates to telecommunications devices, and more particularly to security devices adapted for use with audible facsimile and data transmissions, then turning to the background of the invention which describes using a security device in connection with existing wired and wireless telephones. Picking up on your point, Judge Bryson, it is correct that later on in the invention it describes the benefit of having a separate security device because if you lose the computer and the encryption keys were in that computer, that is worse for you than having two separate devices. Everything that is described within the specification talks about it in the context of having a separate and distinct security device from the microprocessor based device. The district court went through a thorough analysis, starting with the claim language itself, as this court has directed it to do, went through the intrinsic record and found correctly what we believe, that security device has three characteristics, it is standalone, separate, and external. This court only needs to find that one of those is true. We believe all three are true. But under the stipulation of non-infringement, the parties agreed that the devices at issue here are neither separate, nor standalone, nor external, both on direct infringement and under the literal infringement and under the doctrine of equivalence. Turning to the point-to-point language, the question, Judge Bryson, regarding IE versus EG, we believe that whether it is IE or EG, the specification clearly set forth that the question is, what is point-to-point? It gave an example or definition that non-point-to-point are communications over the internet. It's there in column 10 and it's public notice of patents, one is entitled to rely upon it. There is nowhere else within the specification that describes point-to-point as communications occurring over the internet. The specification tells you what's not point-to-point. And all we're asking this court to do is affirm the district court's decision, which excluded the internet from point-to-point communications. What exactly do you understand the patent to have meant by the term point-to-point? Well that's a difficulty. I think the patent sets forth what is not point-to-point. I think there's 112 issues that arise when you try to look at, well what is the patent talking about when it says point-to-point? It doesn't say it. The parties don't argue that there's a common and understood meaning of point-to-point outside of the context of this patent. Back in 1999-2000, what their meaning is. So we're looking within the four corners of the patent and it tells you what's not point-to-point and that's over the internet. It could be inferred, I suppose, from the sentence that follows the infamous IE, where the patent says, and these types of non-real-time transmissions suggest that point-to-point might be a real-time transmission. Would you agree with that characterization? I think that the patent specifically refers to, defines point-to-point in connection with internet. I believe that you can, internet transmissions are often not quote-unquote real-time because they are packet-based communications which scramble the transmissions and they're not quote-unquote real-time transmissions. So I don't think there's anything inconsistent between excluding the internet and the discussion regarding non-point-to-point and not real-time. And so, taking column 10, which either whether it's definitional or giving an example of what's non-point-to-point, looking at the rest of the specification which doesn't anywhere else specifically describe what point-to-point is, and I'd also point out that in the claims within the patent, not all of the claims require point-to-point. It was a term that was used in a number of the claims, but Claim 21 does not include a point-to-point requirement. So any suggestion that somehow we're trying to read out preferred embodiments here is not correct because Claim 21 would cover internet-based embodiments. It was the patentee's decision to use point-to-point in the rest of the claims, including Claim 1 and Claim 13. So point-to-point has to have some meaning. And the patentee told us what point-to-point doesn't mean, and the district court found that point-to-point excludes communications over the internet. And there is nothing within the specification that we believe dictates a different result. Is it possible to have a point-to-point communication session that comprises non-point-to-point transmissions? I'm just looking at the difference between the use of session in the claims and transmissions in the spec. It's possible to have a point-to-point communication session that includes non-point-to-point transmissions. I think the patent really has two separate sessions. It has point-to-point sessions and it has non-point-to-point sessions. And so I would say that, at least under the specification as it's described, that situation wouldn't be possible, that there are two separate entities. Either you have a point-to-point communication session or you have a non-point-to-point communication session. Whether that can be done within the same sitting, for example, you start off point-to-point and then you stop that point-to-point communication session and then have a non-point-to-point communication session, that may be possible. But I think keeping a point-to-point communication session open and then having non-point-to-point within it, we're really talking about different sessions. The patent doesn't specifically define what sessions are. Sessions weren't a claim term that was in dispute. It's really the question of point-to-point versus non-point-to-point. And we think the patent is quite clear that non-point-to-point excludes the Internet. If we were to reject the argument that point-to-point can't include the Internet, but were to conclude that point-to-point really should be understood to mean a type of real-time transmission, would that, in your view, change the analysis or outcome of this case, given your characterization of the way the Internet communicates or affects communications? Our position would be that the Internet really is not real-time communications because it is a packet-based communication system. And that, in our view, is not real-time. If we were to reach that conclusion, rejecting the district court's analysis of Internet as being not a point-to-point, but nonetheless that point-to-point means real-time transmission, would that require a remand, in your view? I think you can certainly take judicial notice as to whether point-to-point requires real-time or whether the Internet is real-time. So it wouldn't necessarily require a remand. We have a number of bases for affirming the district court's decision. One is the question of security device... Right, as opposed to the science of the point-to-point issue, I understand. But within the context of the point-to-point, I'm really trying to see if there's a difference between saying that the Internet is non-point-to-point versus saying that something that uses the Internet is not something that is a real-time transmission. We believe that both provide a basis for affirming the district court's decision. Just in conclusion, this is not a case about a disclaimer. The security device that is at issue here, there is no common, ordinary, and understood meaning to what a security device is. Security device is something that is completely context-dependent, whether you're talking about a car alarm, even within the realm of computer science and electronic communications. So what Microsoft proposed and what the district court correctly did was take a step-by-step analysis through the claims, through the prosecution, which really wasn't an issue here, and the intrinsic record, and found that a security device is a separate and distinct external device from a microprocessor-based device. Thank you, Mr. Peterman. Mr. Helge has three minutes for rebuttal. Thank you, Your Honor. Your Honor, we are getting led astray here with the focus on the IE with respect to non-point-to-point transmissions. The specification tells us that the Network 60 shown in Figure 1 can include the Internet. And indeed, if we look at the headers running from Column 10, 11, and 12 of the 686 patent, we see a disclosure, we see a roadmap of what the patentee had in mind with respect to point-to-point versus non-point-to-point. In Column 10, we see a header talking about encryption, and we see the importance of real-time versus non-real-time. We see the importance of how that affects the key generation, whether we can use a permanent key or whether we need to create one key for each session. Now, drawing the distinction between real-time and non-real-time, do you see that as an acceptable distinction between the point-to-point and non-point-to-point transmission? I do, Your Honor, because it's actually supported in the Columns 11 and 12. And can you prevail in this case with that definition of point-to-point, given Mr. Peterman's argument that the Internet does not work on a real-time basis? Your Honor, if we were to say the Internet does not work on a real-time basis, that's inconsistent with how the patentee had this transmission in mind. For example, in Column 12, there is the discussion of the key that was previously negotiated between the parties. What that indicates, and this is under simultaneous voice facsimile data transmission, the patentee then refers to the fact that this information, this encrypted data, is being transmitted over the Internet. And this is under the header dealing with simultaneous data transmission. This is what the patentee had in mind as real-time. We haven't had a construction of the term real-time. We haven't had expert testimony on real-time, or what the patentee had in mind. This is simply an issue that hasn't been briefed, because we're really at the claim construction phase, and we're not at a situation where we're looking at the facts of whether Internet transmissions, which the patentee thought could be real-time, are truly real-time under perhaps a different interpretation. So Columns 11 and 12, we are looking at the idea of point-to-point. There is a header at the middle of Column 12 where we start talking about non-point-to-point transmissions. And this here, we talk about the e-mail attachment, we talk about file repositories, and we see that the patentee had in mind that non-point-to-point transmissions could occur over the Internet. And in fact, those are the only embodiments that they described. Do you emphasize that Element 60 could be the Internet? Yes, Your Honor. But it also says it could be a PSTN, right? It does, Your Honor. Is a PSTN point-to-point communication, no matter how it's defined, either as real-time or as being not the Internet? PSTN is only described in the context, or it would not include the non-point-to-point. It simply isn't within part of the embodiments that the non-point-to-point described. But the Communication System 60 in Column 12 doesn't say point-to-point is only the PSTN. It simply says the Communication System 60, which we refer back to, includes the Internet. Your Honor, I see my time is up. If there are any further questions, I'd be happy to answer them. Thank you, Mr. Helge. We'll take the case under review.